IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>DONELL ALFRED HOPKINS,<br><br>    Defendant. | No. CR14-0120<br><br>REPORT AND RECOMMENDATION |

TABLE OF CONTENTS

I.    *INTRODUCTION* .................................... 2

II.   *PROCEDURAL HISTORY* ............................. 2

III.  *ISSUES PRESENTED* ................................ 2

IV.  *RELEVANT FACTS* .................................. 2
    A.   *Dog sniff* ........................................ 2
    B.   *Warrant Issuance and Surveillance* ................ 4
    C.   *Warrant Execution* ................................ 5

V.    *DISCUSSION* ....................................... 6
    A.   *Warrant Issuance* ................................. 7
        1.   Did the Dog Sniff Violate the Fourth Amendment? ........ 8
        2.   Is There Probable Cause for the Warrant, Excluding the Dog
            Sniff? ........................................ 10
        3.   Does the Leon Good Faith Exception Apply? ........... 11
    B.   *Warrant Execution* ................................ 12
    C.   *Search and Seizure* ............................... 13

VI.  *RECOMMENDATION* ................................ 16

## I. INTRODUCTION

On the 22nd day of June 2015, this matter came on for hearing on the Motion to Suppress (docket number 50) filed by the Defendant on April 14, 2015. The Government was represented by Special Assistant United States Attorney Erin R. Eldridge. Defendant Donell Alfred Hopkins appeared in person and was represented by his attorney, Mark C. Meyer.

## II. PROCEDURAL HISTORY

On October 30, 2014, Defendant Donell Alfred Hopkins was charged by Indictment with possession with intent to distribute controlled substances and being a prohibited person in possession of a firearm and ammunition. Defendant appeared on March 10, 2015 and entered a plea of not guilty. Trial was scheduled before Chief Judge Linda R. Reade on May 11, 2015.

On April 14, 2015 Defendant timely filed the instant motion to suppress. The Government filed its resistance on June 18. Because of the pending motion to suppress, the trial was continued to August 10, 2015.

## III. ISSUES PRESENTED

Defendant claims that his Fourth Amendment rights were violated by an unlawful search and a wrongful seizure, and the fruits of the search must be suppressed. First, Defendant claims that officers obtained a warrant to search his residence by relying on evidence obtained through an unlawful dog sniff. Second, Defendant argues the warrant was wrongfully executed during nighttime hours. Third, Defendant asserts that officers seized him, searched his person, and arrested him without probable cause.

## IV. RELEVANT FACTS

### A. Dog sniff

At approximately 10:00 p.m. on October 22, 2013, Officer Al Fear, of the Cedar Rapids Police Department K-9 unit, and his dog, Marco, went to Cambridge Townhouses,

a residential complex on North Towne Lane NE in Cedar Rapids, to investigate possible drug-related activity. Fear had obtained information from another officer that a black male with a street name of "Smoke" had been dealing narcotics from that location.

Cambridge Townhouses consists of multiple buildings under the same management. A large main sidewalk runs parallel to two buildings on either side. Three smaller sidewalks branch off the main sidewalk, leading to a shared cement space adjacent to the doorways of two neighboring units. Odd-numbered units are on the east side of the building, and even-numbered units are on the west side.[1] Officer Fear testified he did not notify management that he would be conducting a dog sniff that particular evening. However, the Cedar Rapids Police Department has standing permission from the complex's management to patrol the area and investigate alleged violations or offenses of law occurring at the complex, and the police have written tickets for offenses occurring in the outside common areas. According to Fear, the management "encourages officers to come to the location and patrol" and has given the police department "numerous tips of narcotics use and illegal activities," which the department then investigated.[2]

Upon arriving at the townhouses on October 22, Officer Fear unleashed Marco to run alongside the building, starting on the southeast side, where the odd-numbered units were located, and then continuing on to the northwest side of the unit, where the even-numbered units were located. According to Fear, Marco ran mostly in the grassy areas

---

[1] Government's Exhibit 1 provides an aerial view of the complex. Government's Exhibit 2 at 3 shows that walkways connecting the even-numbered units to the main sidewalk are elevated by three stairs. Walkways connecting the odd-numbered units to the main sidewalk are level and do not contain stairs.

[2] Defendant's Exhibit A is Defendant's lease for Apartment #06 of 2053 North Towne Ct. NE. During the hearing, Defendant's counsel asked Officer Fear if he was aware that the lease did not give notice of the police's standing permission to be on the premise. Fear testified that he was not aware, as he had never seen a lease for residences in the complex.

and sniffed along the bottom of each door, getting within approximately six to eight inches of the door. Marco stopped at Apartment 6 and indicated the presence of a controlled substance by passive alert.[3] Fear testified that this behavior indicated the presence of a controlled substance inside the unit.[4]

### B. *Warrant Issuance and Surveillance*

The next day, on October 23, Officer Fear applied for and obtained a state search warrant for Apartment 6, along with any other storage units, garages or vehicles registered to the apartment.[5] In the application for the warrant, Fear noted that he had received a tip from another officer about alleged narcotics activity at the complex, and provided evidence of Marco's behavior upon visiting Apartment 6 the day prior. After the state judicial magistrate issued the warrant, Fear conducted additional surveillance on Apartment 6 that day and the Sunday following.[6] Fear testified that he observed the same black male coming and going from the apartment, meeting with other individuals outside the apartment, and completing what he believed to be quick narcotics transactions.

---

[3] Officer Fear described Marco's change in behavior as a "passive alert," where a trained dog will sit and stare at the source of a particular narcotic odor until they receive a reward.

[4] When asked if Marco's response could have indicated a lingering smell of narcotics, Officer Fear testified that it was unlikely, because the dog's behavior indicated a "scent cone,"where he narrowed in on one particular location on the door. He would not have acted this way, according to Fear, had the scent been weaker.

[5] A copy of the application for search warrant was introduced as Government's Exhibit 3.

[6] The search warrant was issued on Wednesday, October 23, 2013.

## C. Warrant Execution

At approximately 10:00 p.m. on October 28, Officer Fear was a part of group of eight to ten officers who executed the search warrant on Apartment 6.[7] Upon approaching the building, Fear saw two male subjects coming from Apartment 6 and walk across the grass toward steps leading to a parking area. One of the subjects was the same individual Fear observed during his surveillance in the days proceeding.[8] Fear testified that he and the other officers immediately drew their weapons, shouted "police," and ordered the two men to the ground. The subject Fear had previously observed (later identified as Defendant Donnell Hopkins) immediately complied with the request, but the other subject (later identified as Defendant's brother Robert Hopkins) fled on foot.[9] When asked why officers ordered the two subjects to the ground, Fear testified that it is "common practice" to pat down subjects for "officer safety issues." Fear acknowledged the warrant only authorized a search of the residence.

Officers handcuffed Defendant and, when patting him down, felt a "bulky" item on Defendant's right side. The officer conducting the pat-down asked Defendant what the item was, and Defendant responded that it was a gun. Subsequently, officers retrieved a loaded .357 caliber Smith and Wesson revolver, 45 baggies of crack cocaine (totaling 3.16

---

[7] Officer Fear testified that up until and through the execution of the warrant, only state agency officers were involved in the investigation. No federal officer or agency was involved. Fear also testified that all officers were in uniform and were not wearing body cameras.

[8] Officer Fear testified that he had not contacted the apartment management to determine the identity of the tenant residing in Apartment 6, nor had he established the identity of the male he observed in the days prior.

[9] Prior to being apprehended by officers, Robert Hopkins threw a stolen handgun which was retrieved by officers. Robert Hopkins was charged as co-defendant with Donnell Hopkins in the instant case (docket number 3) Robert Hopkins pled guilty to distribution of heroin in prior proceedings (docket number 20).

grams), and 7 baggies of marijuana (totaling 2.5 grams) from the Defendant's person. Officer Fear testified that the packaging of the narcotics was consistent with distribution. Defendant was then taken to the police department for questioning before being released.

Officer Fear testified that because officers had retrieved two weapons, the situation had become dangerous and the Special Response Team was called to aid in securing the residence so the warrant could be executed. Once the apartment had been secured, officers executed the warrant at approximately 12:30 a.m. and recovered a shoe box in one bedroom containing what was later determined to be 1.51 grams of heroin, 1.31 grams of cocaine, 25.28 grams of cocaine base, and 51.7 grams of marijuana. Fear testified that the drugs were packaged consistently with distribution. In addition to the narcotics, officers also recovered two digital scales, packaging material, and ten rounds of .357 caliber ammunition, which was later determined to match the firearm recovered from Defendant's person during the prior pat-down.

## V. DISCUSSION

Defendant asks that all evidence obtained in his residence under authority of the search warrant be suppressed, arguing (1) the warrant was unlawfully issued because it relied on evidence obtained through wrongful execution of a dog sniff on his property, and (2) the warrant was improperly executed during nighttime hours in violation of FED. R. CRIM. P. 41. The Defendant also asserts that (3) evidence obtained on his person should be suppressed, as it was obtained through unlawful search and seizure, and without probable cause.

In its response, the Government argues the dog sniff did not infringe upon any legally protected areas, and there was probable cause to issue the warrant. In addition, the Government argues that even if the Court finds the search warrant was improvidently granted, the *Leon* Good Faith exception applies. The Government also argues that RULE 41 does not apply, as the search was conducted by state law enforcement authorities.

Finally, the Government argues that the pat-down of Defendant was lawful, as there was reasonable suspicion to believe Defendant was connected to criminal activity, and evidence on Defendant's person is otherwise admissible due to the inevitable discovery exception.

### A. Warrant Issuance

Defendant's argument regarding the alleged unlawful execution of the dog sniff relies heavily on *Florida v. Jardines*, 569 U.S.\_\_\_\_, 133 S. Ct. 1409 (2013), where the Supreme Court held that a dog sniff of the defendant's porch constituted a warrantless search of protected curtilage in violation of the Fourth Amendment. In *Jardines*, officers obtained a search warrant based on evidence obtained from the canine's positive reaction to narcotics from its sniff of the defendant's porch. *Id.* at 1415. The Court found that not only was the porch protected curtilage, but the police also did not have implicit license to conduct a search of the area. *Id.* Acknowledging the extent of a stranger's implicit license to knock on the door of a private residence, the Court drew a line in *Jardines* that "introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do that." *Id.* at 1416.

The Eighth Circuit Court of Appeals has been cautious in interpreting *Jardines'* application in subsequent cases, especially those concerning shared residential spaces, often determining that the decision need not be applied because the dog sniff at issue occurred prior to the *Jardines* decision. *See United States v. Mathews*, 784 F.3d 1232, 1235 (8th Cir. 2015); *United States v. Hunter*, 770 F.3d 740, 743 (8th Cir. 2014); *United States v. Givens*, 763 F.3d 987, 992 (8th Cir. 2014); *United States v. Davis*, 760 F.3d 901, 904-05 (8th Cir. 2014) (holding that a *Jardines* analysis need not be performed, because at the time of the dog sniff, *Jardines* had not been decided, and the officers were reasonably acting on 'binding circuit precedent'). Prior Eighth Circuit precedent established that the use of a dog to sniff around the doorways of residences in an apartment complex did not

constitute a search under the Fourth Amendment. *United States v. Scott*, 610 F.3d 1009, 1015 (8th Cir. 2010). Accordingly, prior to *Jardines*, officers could rely on Eighth Circuit precedent in conducting dog sniffs outside the doorways of residences in an apartment complex.

In this case, however, Officer Fear conducted the dog sniff at Cambridge Townhouses on October 22, 2013, nearly seven months after the *Jardines* decision had been issued.[10] Accordingly, the Court must consider whether, under the circumstances in this case, *Jardines* prohibits the use of the dog sniff to establish probable cause for the search warrant and, if so, whether the warrant is supported by probable cause if the information regarding the dog sniff is removed.

### 1. Did the Dog Sniff Violate the Fourth Amendment?

The *Jardines* Court concluded "there is no doubt" the dog sniff occurred within the protected curtilage of the home — its front porch. *Jardines* at 1415. Unfortunately, determining whether the cement area outside Defendant's front door is protected curtilage is not so clear. Factors which the court must consider in determining curtilage include "proximity of the area claimed to be curtilage of the home, whether area is included within the enclosure surrounding the home, nature of the uses to which the area is put, and steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn*, 480 U.S. 294, 301 (1987). Because multi-family residential complexes have more areas with shared space, the protected curtilage is more restricted.

Defendant argues that the landing space outside Apartment 6 and Apartment 8, where Marco sniffed, constitutes protected curtilage, citing this Court's prior decision in

---

[10] When asked during the hearing whether he was familiar with the *Jardines* decision, Officer Fear admitted he was; however, he claimed the decision did not apply in these circumstances.

8

*United States v. Burston*, 2014 WL 4364468, at *4.[11] That case involved a dog sniff of the same residential complex by the same canine. *Burston* is distinguishable, however, because in that case Marco alerted to the odor of drugs while he was sniffing in a grassy area 6 to 8 inches from an open window of a specific residence, not a shared space. *Id.* at 1.

The facts in this case present a much closer question. While the slab of cement outside Apartments 6 and 8 is obviously a shared space in a multi-residence complex, it is unclear to what extent shared spaces constitute common areas, and thus exempt from Fourth Amendment protection. In *Jardines* it was clear that the porch was protected curtilage; *i.e.*, a place with a reasonable expectation of exclusivity and belonging to only one residence. Thus, at first glance it would seem that a strict application of *Jardines* would be inapplicable here. However, does the analysis really change if a space is shared by only one other residence? What if a front porch is shared by two apartment units within the same house, or if a concrete landing is shared by occupants of a duplex, or connect multiple units sharing the same entryway? Arguably, these "common areas" are only common to select individuals with connecting residences. Seemingly, these shared spaces are in close proximity to the home and constitute protected curtilage. Is there an implicit license giving strangers the authority to linger longer, or engage in more activities than those permitted at a single residence? Where do we draw the line?

The parties have not cited any cases addressing dog sniffs post-*Jardines*, and the Court has found none. The *Jardines* Court focused on the type of activity (*i.e.*, license) strangers are entitled to engage in on private property. "A license may be implied from the habits of the country." 133 S. Ct. at 1415. "This implicit license typically permits the

---

[11] *See* Defendant's Brief (docket number 50) at 5. *Burston* was decided while the *Jardines* case was pending before the Supreme Court.

9

visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.*

Here, the Court must determine if Officer Fear had an express or implied license to conduct a drug sniff in an area shared by only two residences. I don't believe he did. As noted by the Court in *Jardines*, there may be an implied license for strangers such as Girl Scouts or trick-or-treaters — or police officers — to approach a front door and knock, "[b]ut introducing a trained police dog to explore the area around the house in hopes of discovering incriminating evidence is something else." *Id.* at 1416. While not as grand, the cement slab in front of Defendant's residence was, in effect, his "front porch." The fact that the space is shared with one other unit does not expand the scope of the "implicit license" which has become the "habit of the country." Furthermore, I cannot find on this record that an express license was granted by the complex's management to conduct dog sniffs at the cracks of its residents' front doors. I conclude this space is protected curtilage, there was no express or implied license to conduct a dog sniff, and the dog sniff constituted an unlawful Fourth Amendment search.

### 2. *Is There Probable Cause for the Warrant, Excluding the Dog Sniff?*

Because the dog sniff violated Defendant's Fourth Amendment rights, the Court must determine if, after removing the evidence obtained during the dog sniff from the warrant application, there was still probable cause to issue a warrant. The facts supporting probable cause are found in three paragraphs of Attachment A:

> V) On 10-22-13 at approximately 2200 hours, the affiant was performing a follow up on Information relating to narcotics activity at 2053 Northtowne Lane NE. The affiant received information from patrol officers Cruse and Tran of possible narcotics trafficking. Officer Cruse asked that I walk my narcotics canine around building 2053.

> W) As I walked my narcotics canine, Marco, around building 2053, Marco sniffed the door bottoms of all the apartments from the outside common area. As Marco approached apartment #6, I observed a change in behavior as Marco showed a positive alert for the presence of a controlled substance.
>
> X) The door which Marco sniffed is an exterrior [sic] door to apartment #6 which leads to the outside common area of the complex. The door of apartment #6 is clearly marked.

Application for Search Warrant, Attachment A (Government's Exhibit 3).

As set forth above, Officer Fear's search warrant application lists only a tip from a fellow officer and Marco's positive alert as evidence of narcotics inside the apartment. Excluding the information obtained through Marco's search, there would not be enough probable cause to issue the warrant.

### 3. Does the Leon Good Faith Exception Apply?

While I conclude the search warrant is invalid, that does not end the analysis. Certain deference must be given to law enforcement under the *Leon* exception.[12] *Leon* held that disputed evidence will be admitted if it was objectively reasonable for the officer executing the search warrant to have relied in good faith on the judge's determination that there was probable cause to issue the warrant. 468 U.S. at 922. The *Leon* good faith exception does not apply, however, in some cases:

> (1) [W]hen the affidavit or testimony in support of the warrant included a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant was "so lacking in indicia of probable cause as to render official beliefs in its existence entirely

---

[12] *United States v. Leon*, 468 U.S. 897 (1984).

unreasonable;" and (4) when the warrant is "so facially deficient" that the executing officer could not reasonably presume the warrant to be valid.

*United States v. Grant*, 490 F.3d 627,632-33 (2007)).

Although *Jardines* had been decided prior to Officer Fear's investigation in the instant case, I believe it was objectively reasonable for him to rely on the search warrant issued by the judicial magistrate. Fear testified that he was aware of the holding in *Jardines*; however, he believed it did not apply. Given that *Jardines* concerned a private residence, and not a shared complex, it is reasonable that a law enforcement officer may have believed the holding did not apply to apartment buildings. To my knowledge, the Eighth Circuit has yet to address this issue on its merits, and there certainly wasn't any case authority existing prior to October 23, 2013 (when the warrant was issued).

In addition, none of the four *Grant* factors indicating a need for suppression exists here. The affidavit did not include any false statements, the judicial magistrate did not "wholly abandon his judicial role," the affidavit (with the dog sniff information included) provided probable cause, and there are no "facial deficiencies" on the warrant. Thus, even if the district court finds the dog sniff to be a violation of Defendant's Fourth Amendment rights, the *Leon* exception provides the exclusionary rule does not apply, and the evidence obtained pursuant to the warrant is nonetheless admissible.

### B. Warrant Execution

The Defendant argues that law enforcement violated FED. R. CRIM. P. 41 by executing the search warrant during the nighttime hours.[13] At the time of the search in this case, however, federal authorities were not a part of the investigation and, consequently, federal rules are inapplicable. It is well-established that where there is no

---

[13] RULE 41 requires the executing officer to "execute the warrant during the daytime, unless the judge for good cause expressly authorizes execution at another time." FED. R. CRIM. P. 41(e)(2)(A)(ii).

federal involvement in a particular search, even if the assistant United States attorney subsequently becomes involved, the acts performed in prior investigations do not "subject the search to federal standards." *United States v. Goodson*, 165 F.3d 610,614 (8th Cir. 1999); *United States v. Sherrill*, 27 F. 3d 344, 347 (8th Cir. 1994). The Court notes parenthetically that Iowa Code § 808.5 provides "the warrant may be executed in the daytime or nighttime."

### C. Search and Seizure

The remaining issue is whether evidence found on Defendant's person prior to executing the warrant must be suppressed. Whether law enforcement violated the Defendant's Fourth Amendment rights by unlawful search and seizure depends on whether the initial stop constituted a *Terry* stop, as defined in *Terry v. Ohio*, 392 U.S. 1 (1968). If, as the Government contends, the initial search was a *Terry* stop, law enforcement need only prove, under totality of the circumstances, that they had reasonable, articulable suspicion that Defendant was involved in criminal activity. However, if the initial stop was not commensurate with a *Terry* stop, and constituted the force associated with an arrest, law enforcement needed probable cause to justify their search. *Id.* at 21.

Here, the issue is whether officers were justified in drawing their weapons and ordering Defendant to the ground before searching him. Arguably, such actions constitute more than an ordinary *Terry* "stop and frisk." *Terry* at 12. However, courts have given law enforcement officers considerable leeway in assessing their reactions to threatening situations, with the Third Circuit Court of Appeals holding that "in effectuating a valid *Terry* stop, police officers are allowed to use reasonable amount of force." *United States v. Bonner*, 363 F.3d 213, 217 (3d Cir. 2004) (citing *Graham v Connor*, 490 U.S. 386 (1989)).

The Eighth Circuit Court of Appeals found a valid *Terry* stop in *United States v. Smith*, 648 F.3d 654, 659 (8th Cir. 2011), when police ordered an armed robbery suspect

from the vehicle with their weapons drawn. Noting the suspect's attempts to evade arrest and alleged connection to a dangerous crime, the court found the force used in the stop, given the totality of the circumstances, was justified. *Id.* The court noted:

> As part of a lawful *Terry* stop, officers may take any measures that are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop. When officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish their weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety.

*Id.* (citing *United States v. Fisher*, 364 F.3d 970, 973 (8th Cir. 2004)).

Similarly, in *United States v. Martinez-Cortes*, 566 F.3d 767, 769 (8th Cir. 2009), the court found that law enforcement was justified in stopping a vehicle leaving a residence when the police, investigating alleged drug-related activity, arrived to execute a search warrant. After ordering the individuals from the car and handcuffing them, officers discovered drugs in the vehicle. *Id.* The court acknowledged the risks associated with drug-related activity, noting that the officers' actions were justified in the interests of officer safety. *Id.* At an investigatory stop, when an individual is suspected of drug involvement, it is reasonable for a police officer to believe that the individual may be armed and dangerous. *United States v. Robinson*, 119 F.3d 663, 667 (8th Cir. 1997). *See also United States v. Bustos-Torres*, 396 F.3d 935, 943 (8th Cir. 2005) ("Because weapons and violence are frequently associated with drug transactions, it is reasonable for an officer to believe a person may be armed and dangerous when the person is suspected of being involved in a drug transaction.").

Although the Eighth Circuit Court of Appeals has observed that a *Terry* stop *can* become an arrest should it "last for an unreasonably long time or if officers use unreasonable force," courts still give great deference to law enforcement officials. *Smith* at 659 (citing *United States v. Newell*, 596 F.3d 876, 879 (8th Cir. 2010)) Other circuit

courts have shown similar deference. *See generally, United States v. Garcia*, 339 F.3d 116 (2d Cir. 2003); *Dorsey v. Barber*, 517 F.3d 389 (6th Cir. 2008) (holding the totality of the circumstances justified the applicable force used in executing a *Terry* stop).

The facts of the instant case provide no reason for exception. Just as officers were justified in stopping the alleged suspects in *Martinez-Cortez*, officers also had reasonable suspicion to stop Defendant and his brother upon arriving at the residence. The issuing magistrate concluded there was probable cause to issue a search warrant of the premise for purposes of investigating alleged drug-related activity. Officer Fear testified the subjects were coming from apartment 6, and he recognized Defendant as the person he had seen earlier. Because drug-related activity often implicates violent conduct, it was reasonable for officers to secure the individuals in the interest of officer safety while the search warrant was executed.

Defendant argues that his mere presence in front of the residence was not probable cause for stopping him, citing, *inter alia*, *Ybarra v. Illinois*, 444 U.S. 85 (1979), where a patron was searched when police executed a search warrant on a bar. This comparison is not consistent, however, with the facts in this case, as Defendant had been seen in front of the apartment conducting alleged transactions in the days prior to the execution of the warrant. Thus, a nexus had been established between Defendant and the alleged criminal behavior that was not evident in *Ybarra*. In addition, as discussed, the police need only have reasonable articulable suspicion to stop Defendant for a *Terry* stop, and the observations of Defendant in the days prior, together with his known connection to the apartment to be searched, provided sufficient suspicion.

Furthermore, the totality of the circumstances justified the officers' use of force. Not only were the officers present to investigate possible drug-related activity, but it was also after 10:00 p.m., and Defendant was not alone. In addition, officers did not know if other persons may be inside the house. Officer safety was a legitimate concern. This

caution was further corroborated when Defendant's brother attempted to flee the scene, leading officers on a foot chase where another weapon was discovered.

Thus, there was reasonable, articulable suspicion to justify the *Terry* stop and the force used in executing the stop. During a pat-down, a bulky item was found in Defendant's pocket. The item was not removed by law enforcement officers until after Defendant told police it was a gun. Upon further search, the weapon and drugs were discovered. This procedure is consistent with a lawful *Terry* stop.[14]

### VI. RECOMMENDATION

For the reasons set forth above, it is respectfully **RECOMMENDED** that the Motion to Suppress (docket number 50) filed by the Defendant be **DENIED**.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on June 22, 2015.*

DATED this 6th day of July, 2015.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA

---

[14] Alternatively, as the Government argues, even if the district court finds that officers were not justified in immediately ordering Defendant to the ground, it is reasonable to conclude they would have inevitably seized the contraband and weapon from Defendant upon a lawful pat-down.